## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|                            |   |                       |
|----------------------------|---|-----------------------|
| DENNIS KELLY               | : |                       |
|                            | : |                       |
| v.                         | : | Civil No. CCB-05-1171 |
|                            | : |                       |
| SASOL NORTH AMERICA, INC.  | : |                       |
|                            | : |                       |

## MEMORANDUM

Plaintiff Dennis Kelly was an employee of Sasol North America, Inc. ("Sasol") from 2001 to 2004.  Kelly alleges that Sasol violated the Americans with Disabilities Act ("ADA") when Sasol refused to allow him to return to work after he suffered a flare-up of a preexisting back condition, and eventually forced him to retire rather than be terminated.  Now pending before the Court is a motion by Sasol for summary judgment.  The parties have fully briefed the motion and no hearing is necessary.  Local Rule 105.6.  For the reasons stated below, the defendant's motion will be granted in full.

## BACKGROUND

Sasol is an integrated producer of commodity and specialty chemicals.  It has manufacturing facilities in several locations, including a chemical plant in Baltimore, Maryland.

Kelly was employed by Sasol from 2001 to July 23, 2004.[1]  He held various positions at the Baltimore plant over the years, including that of general laborer, operator, pumper, and chlorinator.  In 1992, he became a safety helper, and in 1998, he became a safety technician.  In or about February 2003, the Baltimore plant was restructured and a number of employees were

---

[1] Kelly began working at the Baltimore plant in 1978. Before Sasol purchased the plant in 2001, he was employed by the plant's previous owners, Conoco Chemicals and Vista Chemicals.

laid off or offered early retirement.  With the restructuring, Kelly's safety technician position was eliminated, and he was assigned to a newly created position called multi-skill mechanic.

Multi-skill mechanics were required to become proficient in three separate crafts, as well as a host of "major" or "core" responsibilities.  Because Kelly was just starting in the position, he only was qualified to perform the "major" responsibilities of the position.  These included, but were not limited to: heat exchanger work; removal and installation of filter materials throughout the plant; general labor duties such as cleaning tanks, yard clean-up, digging, tower packing, etc.; operating forklifts to move parts and equipment; and taking prompt and appropriate action in response to SHE (safety, health, and environmental) incidents, such as fires.

In April 2003, Kelly experienced a flare-up of a preexisting back condition that he had suffered from since approximately 1979.  Kelly subsequently was diagnosed with spinal arthritis with disc disease and disc herniations. Because of this flare-up, Kelly was forced to take leave on or about April 21, 2003.  Kelly was unable to work for most of May and June 2003.  He returned to work on or about June 20, 2003, but had another flare-up of his back condition on or about July 24, and was again forced to take leave.

Beginning on or about August 7, 2003, Kelly was treated by Dr. Melinda Ann Roth. Kelly submitted regular Work/Activity Status Reports from Dr. Roth while he was off work in August and September 2003.  As of October 3, 2003, Kelly remained unable to work.

On or about September 2, 2003, Dr. Roth referred Kelly to Dr. Scott Cole for epidural steroid injections.  Prior to this treatment, Kelly had not experienced any significant relief from the symptoms of his back condition.  Kelly received two injections prior to October 17, 2003,

and as a result experienced some relief from his symptoms.  In her treatment notes from October 17, 2003, Dr. Roth described the improvements in the symptoms Kelly was experiencing, but noted that once he returned to work, he should engage in a work hardening program.  Dr. Roth also noted that Kelly should not perform work that was directly overhead, causing his back to arch.  On that same date, however, Dr. Roth completed a work/activity status report indicating that Kelly could return to work without restrictions on October 20, 2003.

Sasol employees who miss work due to an injury or illness receive their full rate of pay for three months.  Only after an employee misses 90 consecutive calendar days is his compensation reduced to half-pay.  If an employee returns to work at any time prior to missing three consecutive months, the 90-day clock starts over again and the employee does not face the pay reduction for another three months.

On October 7, 2003, Sasol human resources representative Joe Ann Williams sent Kelly a letter informing him that effective October 21, 2003, he would begin receiving half his rate of pay.  Shortly thereafter, Kelly submitted the report from Dr. Roth stating that he could return to work with no restrictions.

Sasol found the timing of the report to be suspicious, as it was submitted shortly after Sasol notified Kelly that his pay would be reduced.  Accordingly, Williams asked Kelly to send his medical records to Dr. Bonnie New, Sasol's corporate medical manager.  Dr. New then reviewed the records and requested further information from Dr. Roth.  Dr. Roth responded to Dr. New in writing, and in a subsequent telephone conversation, Dr. Roth clarified her letter, explaining to Dr. New that Kelly should not engage in overhead work that required back extension.  Dr. Roth also recommended that Kelly participate in a work hardening program given

3

the strenuous nature of his job.

By letter dated December 1, 2003, Sasol notified Kelly that he would not be allowed to return to work.  This decision was made based on Dr. New's correspondence and her conversation with Dr. Roth.  Sasol gave three reasons for this decision.  First, Sasol found that:

> after discussion with your physician, our medical director advised us that you will continue to have permanent work-related job limitations, specifically the restricted ability to perform overhead work.  This task is one of the essential functions of your job.

Def. Mot. Summ. J., Ex. J.  Second, Sasol claimed that based on the fact that Kelly had missed a significant amount of time since April 2003, "it is clear to us that you are unable to routinely attend work."  *Id.*  Third, Sasol found that "there are no open alternative jobs to assign you to at this time."  *Id.*  Accordingly, Sasol directed that Kelly would be on medical leave until July 23, 2004, at which time he would be terminated.

Kelly responded by insisting that he could return to work – despite the overhead work restriction imposed by Dr. Roth – if Sasol could accommodate him through "the use of readily available equipment, such as a ladder, JLG, or scaffolding."  Def. Mot. Summ. J., Ex. K.  In response, Sasol asked Kelly if he would be willing to have an examination by an independent physician.  Kelly agreed to do so.

On March 3, 2004, Kelly visited an independent physician, Dr. Stanley Friedler, who is a board certified orthopedic surgeon in Maryland.  In his report, Dr. Friedler opined that Kelly had degenerative arthritis and disc disease, but concluded that "in all probability the patient could perform the job described as a multi-skill mechanic."  Pl. Resp., Ex. 2 at 4.  Based on a request for clarification by Dr. New, however, Dr. Friedler subsequently completed a Job Analysis/Job Restrictions form, whereby he indicated which essential multi-skill mechanic job functions Kelly

4

could and could not do based on his back condition.  In this report, Dr. Friedler determined that

certain work activities, such as bending, stooping, kneeling, and climbing ladders, would place

Kelly at risk for aggravation of his lower back.  Dr. Friedler also found that Kelly should avoid

two activities completely – lifting/carrying 51-100 pounds and pushing/pulling 51-100 pounds –

and placed moderate restraints on two other job tasks, restricting Kelly from lifting/carrying 25-

100 pounds to a few times a day and restricting him from pushing/pulling 26-50 pounds to three

or four times per hour.  Dr. Friedler also noted that Kelly should avoid driving a forklift on

uneven surfaces.

       After he was evaluated by Dr. Friedler, Kelly met with Williams, Ron Pozza (Sasol's

safety and health manager) and Richard Boenig (Sasol's maintenance manager) to review the Job

Analysis/Job Restrictions form prepared by Dr. Friedler.  During the meeting, Boenig asked

Kelly if he disagreed with what Dr. Friedler indicated on the Job Analysis/Job Restrictions form.

Kelly indicated that he did not.  Kelly, however, insisted that he could perform the multi-skilled

mechanic position – despite the restrictions imposed by Dr. Friedler – by, for example, picking

up 50-pound salt bags with a forklift, working smarter, and using leverage to create torque.

Subsequent to the meeting, Boenig and Pozza created a document in which they described the

"major responsibilities" of a multi-skilled mechanic, and compared the job tasks associated with

each to the restrictions imposed by Dr. Friedler.  Boenig decided that, based on the restrictions

imposed by Drs. Roth and Friedler, Kelly could not perform the essential functions of the job.

On April 8, 2004, Boenig notified Kelly of this conclusion via letter, and gave Kelly the option

of either retiring or being terminated on July 23, 2004.  Kelly chose to retire, effective August 1,

2004.  Boenig did tell Kelly that he would keep him in mind for other positions at Sasol that

might become available.

In August 2004, after Kelly's retirement became effective, Kelly took a job at Saunders Molding, where he was principally responsible for feeding molding into a paint machine and bundling the molding.  Kelly left this position after three months in order to make more money, and he was next employed by E.M.A. Pharmacies.  At E.M.A., Kelly was principally responsible for delivering medications and medical supplies to nursing homes.  Because the E.M.A. job was an afternoon shift and he preferred working during the day, in April 2005, Kelly went to work for McKesson Medical & Surgical, where he delivers supplies to medical and dental practitioners.

## ANALYSIS

### I.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## II.

Kelly contends that he was terminated by Sasol because of his back condition and that his termination was in violation of the ADA.  In order to assert a claim under the ADA, Kelly must prove that: (1) he has a disability; (2) he is an "otherwise qualified individual with a disability," *i.e.,* he is able to perform the essential functions of the job at issue with or without a reasonable accommodation; and (3) if a reasonable accommodation is necessary, the denial of such accommodation was made in a discriminatory fashion.  *Bryant v. Better Bus. Bureau of Greater Md.,* 923 F. Supp. 720, 733 (D. Md. 1996).  Sasol argues that it is entitled to summary judgment because Kelly has not demonstrated that he has "a disability."

The ADA defines a "disability" as (a) a physical or mental impairment that substantially limits one or more major life activities; (b) a record of such impairment; or (c) being regarded as having such an impairment.  42 U.S.C. § 12102(2)(2006).  To qualify as disabled under subsection (A) of the ADA's definition of disability, a plaintiff must initially prove that he or she

has a physical or mental impairment.  42 U.S.C § 12102(2)(A).  The medical evidence has

established that Kelly does have a back condition, which he has described as "spinal arthritis"

and "disc disease."  The court will assume, without deciding, that this back condition is a

"physical impairment" under the ADA.   This conclusion, however, is not sufficient to establish

that Kelly is "disabled."  *See Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 195

(2002).  ("Merely having an impairment does not make one disabled for purposes of the ADA.").

To fall within the ADA's protected class, Kelly must show that: (1) that he has a limitation on a

major life activity; and (2) this limitation is substantial.  *See id.*   "Major life activities" include

those activities that are "of central importance to daily life, such as, caring for oneself,

performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."

*Baucom v. Potter,* 225 F. Supp. 2d 585, 591 (D. Md. 2002) (citing 29 C.F.R. § 1630.2(i)).   The

Supreme Court has held that the "substantially limits" requirement indicates that an impairment

must interfere with a major life activity "considerabl[y]" or "to a large degree," *Toyota Motor

Mfg.,*  534 U.S. at 196-97, and that "the impairment's impact must also be permanent or long-

term."  *Id.*  at 198 (internal citations and quotations omitted).


A.

        Kelly claims that he was substantially limited in the following activities, which he asserts

are "major life activities" for purposes of the ADA: brushing his teeth (*i.e.,* caring for oneself);

performing almost any fast movement (*e.g.,* kneeling, standing up, sitting up in bed, etc.);

bending over to tie his shoes; being able to hold his grandson for more than five minutes;

standing and working on something that requires him to look down (*e.g.,* cutting vegetables,

working on a project, etc.); coughing and sneezing; lying on his back to change the oil in his car;

walking over one-half mile at a time; cutting his lawn; general weeding and working on his

knees for an extended period of time; jogging, which he cannot do at all; hiking, which he cannot

do for long periods; and sexual activities.  Kelly is not substantially limited in any major life

activity, however, for two reasons.  First, many of the activities in which Kelly claims to be

limited are not "major life activities" under the ADA.  Second, even assuming some of these

activities are "major life activities," Kelly was not substantially limited in any of them at the

time Sasol allegedly denied him a reasonable accommodation.

As a threshold matter, many of the limitations described by Kelly – such as limitations on

his ability to do yard work, his ability to hold his grandson for extended periods, and his ability

to go jogging and hiking – are simply not the type of physical limitations that constitute a

"disability" under the ADA.  *See generally Weber v. Strippit, Inc.,* 186 F.3d 907, 914 (8th Cir.

1999) (yard work, such as gardening and mowing, is not a major life activity); *Colwell v. Suffolk*

*County Police Dept.,* 158 F.3d 635, 643 (2d Cir. 1998) (yard work not a major life activity);

*Paris v. Arc/Davidson County, Inc.,* 307 F. Supp. 2d 743, 758 (M.D.N.C. 2004) (plaintiff's

inability to perform physical yard work not a significant restriction); *Brown v. Farmland Foods,*

*Inc.,* 178 F. Supp. 2d 961, 973 (N.D. Iowa 2001) (inability to wrestle with children or play

basketball not a disability); *Piascyk v. City of New Haven,* 64 F. Supp. 2d 19, 26 (D. Conn. 1999)

(activities such as running and jumping do not qualify as major life activities under the ADA);

*Kelly v. Drexel Univ.,* 94 F.3d 102, 106 (3d Cir. 1996) (finding that plaintiff, who "certainly

couldn't jog," was not substantially limited in any major life activity).  Kelly also states that he

has problems bending – specifically, he could not lean over quickly and then straighten up.  It is

not clear, however, that bending constitutes a major life activity.  *Parkinson v. Anne Arundel Med. Ctr., Inc.,* 214 F. Supp. 2d 511, 515 (D. Md. 2002).  Kelly provides no contrary authority to contend that it is.  Thus, for purposes of this analysis, the court will assume that bending does not, in fact, constitute a major life activity.  Likewise, it does not appear that "getting up from a sitting position" qualifies as a major life activity.

As to Kelly's other claims, even assuming some of these activities are "major life activities," Kelly was not substantially limited in any of them.   Kelly, for example, admitted at his deposition that he is able to brush his teeth.  Kelly Dep. Tr. 129-30.  Similarly, Kelly admits that he is able to walk, although he is unable to walk more than one-half mile at a time.  Kelly Dec. ¶ 4(c). Kelly, moreover, does not use a cane, crutches, or walking aids, nor has he obtained a handicap parking permit for his car.  In short, Kelly has not presented any evidence to show that his ability to walk is substantially impaired.  *See, e.g., Wood v. Crown Redi-Mix, Inc*., 339 F.3d 682, 685-86 (8th Cir. 2003) (explaining that plaintiff can walk approximately one-quarter of one mile without resting, he walks with a cane on occasion, and he has not obtained a handicapped parking pass; "We categorize Wood's walking limitations as moderate, not substantial, for ADA purposes."); *Talk v. Delta Airlines, Inc.,* 165 F.3d 1021, 1025 (5th Cir. 1999); *Penny v. United Parcel Serv.,* 128 F.3d 408, 415 (6th Cir. 1997); *Kelly v. Drexel Univ.,* 94 F.3d 102 at 105-108.   Kelly's overhead work restriction also does not prohibit him from taking care of household chores.  Indeed, he bought a "little step ladder for the house" for that very purpose.  Kelly Dep. Tr. at 133.

Finally, Kelly sets forth his inability to engage in sexual relations as one of the most important limitations he faces.  Assuming that engaging in sexual relations is a major life

activity, Kelly cannot demonstrate that his inability to engage in sexual relations has any bearing on the accommodations he claims were denied by Sasol.  *See Wood,* 339 F.3d at 687 ("[T]here must be a causal connection between the major life activity that is limited and the accommodation sought.").  Kelly asks for accommodations that would have allowed him to perform his job even with his lifting and overhead work restrictions.  These accommodations are wholly unrelated to whether Kelly can engage in sexual relations.  *See id.* ("It would be a strange result, and one we do not believe Congress intended, to have the viability of Wood's claim that he should have been accommodated as an employee of a truck-driving company turn solely on whether or not he was impotent.").

There is no dispute that Kelly suffers from a debilitating back condition.  This condition has forced him to make certain adjustments to the way he perform various activities, such as how he brushes his teeth.  Nonetheless, Kelly is still able to care for himself, walk (and even hike for short periods), and perform household chores.  Indeed, if Kelly is asking the court to find that these are "substantial" limitations under the ADA, he is asking it to disregard well established Supreme Court precedent.  *See Toyota Motor Mfg.,* 534 U.S. at 202 ("The record ... indicates that [plaintiff's] medical conditions caused her to avoid sweeping, to quit dancing, to occasionally seek help dressing, and to reduce how often she plays with her children, gardens and drives long distances.  But these changes in her life did not amount to such severe restrictions in the activities that are of central importance to most people's daily lives.").  For all these reasons, Kelly cannot meet the Supreme Court's standard for qualifying as disabled under the ADA.

## B.

Kelly also has not demonstrated that he was substantially impaired in the major life

activity of working for several reasons.[2]   First, this claim is in direct conflict with his assertions

in 2003 and 2004 that he could return to work because he suffered from no disability.

Second, an individual does not qualify as disabled if he is only substantially limited in

one particular job.  *See* 29 C.F.R. § 1630.2(j)(3)(i); *Sutton,* 527 U.S. at 492 ("To be substantially

limited in the major life activity of working, then, one must be precluded from more than one

type of job, a specialized job, or a particular job of choice."); *Gupton v. Virginia,* 14 F.3d 203,

205 (4th Cir. 1994) (a plaintiff must show not merely that his disability made him "incapable of

satisfying the singular demands of a particular job, but that it 'foreclose[d] generally [his

opportunity to obtain] the type of employment involved.'").  Kelly asserts that his employment

history at Sasol and the fact that he does not have a college education limit him to working as a

manual laborer.  He has not, however, presented any evidence to show that these two factors

have hindered his employment in a "class of jobs" or a "broad range of jobs in various classes as

compared to the average person having comparable training, skills, and abilities."  29 C.F.R. §

1630.2(j)(3)(i).

In fact, Kelly has found work in the area.  The fact that Kelly found employment is

persuasive evidence that his impairment is not substantially limiting.  *See Pollard v. High's of

Baltimore, Inc.,* 281 F.3d 462, 470-71 (4th Cir. 2002) ("Pollard immediately took [another] job

... when she left High's.  This reinforces our conclusion that Pollard was not substantially limited

in the major life activity of working.").  In August 2004, shortly after leaving Sasol, Kelly went

to work for Saunders Molding in Eldersburg, Maryland, where he bundled molding and put the

---

[2]  The Supreme Court has declined to decide whether "working" is a major life activity,
but has evaluated it as if it does, in fact, constitute a major life activity.  *See Toyota Motor Mfg.,*
534 U.S. at 184; *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 492-93 (1999).

bundles through a machine.  Kelly left this job because he wanted to make more money.  Since then, he has been employed by two different delivery operations, E.M.A. Pharmacies (in Eldersburg, Maryland) and McKesson Medical & Surgical (also in Eldersburg, Maryland).  All of these positions, to some degree, require manual labor.

Kelly could not work as a multi-skilled mechanic at Sasol due to his back condition.  He was not, however, restricted from working in a broad range of jobs involving manual labor, and for this reason, his assertion that he was substantially limited in the major life activity of working must fail.

C.

Kelly claims that even if he was not technically disabled, he still meets the definition of an individual with a disability because he was "regarded as" disabled by Sasol.  One may be "regarded as" disabled under the ADA if either "(1) a covered entity mistakenly believes that [one] has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities."  *Sutton,* 527 U.S. at 489.

Kelly has not produced any evidence to demonstrate that Sasol perceived him as substantially limited in any major activity.  To the contrary, Kelly only can show that Sasol was aware of his back impairment.  This, however, is not sufficient to support a "regarded as" claim.  Indeed, "[t]he fact an employer is aware of an employee's impairment, without more, is insufficient to demonstrate either that the employer regarded the employee as disabled or that perception caused the adverse employment action." *Haulbrook v. Michelin N. Am., Inc.,* 252 F.3d 696, 703 (4th Cir. 2001) (internal quotation and citation omitted).

13

Nor can Kelly show that Sasol regarded him as substantially limited in his ability to work as Sasol only believed that Kelly could not perform the job of multi-skilled mechanic, not a broad range of jobs.  As a matter of law, this is insufficient to support an actionable "regarded as" claim.  According to the Fourth Circuit, a plaintiff will not have a viable "regarded as" claim where, as here, the employer does not regard the impairment as "'foreclos[ing] generally the type of employment involved.'" *Rohan v. Networks Presentations LLC,* 375 F.3d 266, 278 (4th Cir. 2004) (citing *Hooven-Lewis v. Caldera,* 249 F.3d 259, 267 (4th Cir. 2001)).  Kelly has not offered any evidence to show that Sasol regarded him as restricted from performing a broad range of jobs.  To the contrary, Kelly was told, in writing, that Sasol would keep him in mind for other positions in the plant that might become available.  Accordingly, Kelly cannot pursue a "regarded as" claim.

In conclusion, Kelly does not have a disability, so he cannot pursue a claim against Sasol under the ADA.[3]  The court therefore will grant Sasol's motion for summary judgment.

A separate Order follows.

__November 2, 2006__                                     _____/s/_____

Date                                                              Catherine C. Blake
                                                                     United States District Judge

---

[3] Since Kelly does not have a disability under the ADA, it is not necessary to decide whether he was a "qualified individual," whether Sasol provided him with "reasonable accommodation," or whether he would have posed a "direct threat" to others on the job.